UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LUKE GELINAS, Plaintiff | ) | |
| v. | ) | Civil Action No. 10-30192-KPN |
| EDWARD BOISSELLE, TODD DINEEN, AND DAVID GAGNE, Defendants | ) | |

MEMORANDUM AND ORDER WITH REGARD TO CROSS MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 27 and 34)
October 17, 2011

NEIMAN, U.S.M.J.

Luke Gelinas ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. L. ch. 12 § 11I, alleging that Edward Boisselle ("Boisselle"), as chairman of the South Hadley School Committee (the "Committee"), violated his First Amendment rights by preventing him at a school committee meeting from criticizing the school administration for its alleged failure to properly monitor and control school bullying and, more specifically, its handling of matters related to the suicide of Phoebe Prince ("Phoebe"), a high school student. Plaintiff further alleges that Todd Dineen ("Dineen") and David Gagne ("Gagne") (together with Boisselle, "Defendants"), two on-duty police officers who attended the committee meeting, violated his Fourth Amendment rights by unconstitutionally seizing him and escorting him out of the school committee meeting. Defendants, in response, deny Plaintiff's claims and, in addition, argue that they are entitled to qualified immunity.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the jurisdiction of this court. Presently, Defendants seek summary judgment on all of Plaintiff's claims. In turn, Plaintiff seeks summary judgment on his section 1983 claim against Boisselle. For the reasons that follow, the court will allow Defendants' motion with respect to Plaintiff's MCRA and Fourth Amendment claims against Dineen and Gagne, but deny the motion as it concerns Boisselle. The court will also deny Plaintiff's motion for summary judgment.

## I. BACKGROUND

The parties do not dispute the following facts which are construed in a light most favorable to the non-moving party. On January 14, 2010, Phoebe, a student at South Hadley South High School ("South Hadley"), committed suicide allegedly as a result of bullying she suffered by her fellow classmates. (Defendants' Statement of Facts ("Defs. SOF") ¶ 5.) Following Phoebe's death, Plaintiff, on three separate occasions, expressed to both Boisselle, an elected member of the Committee and its chairman, and Dr. Gus Sayer, the Superintendent of Schools for South Hadley, his concern that the school administration had improperly handled the events leading up to and surrounding Phoebe's death. (Id. ¶ 7.)

On April 14, 2010, at 6:30 p.m., the Committee held a public meeting in the South Hadley High School library. (Id. ¶ 11.) Prior to the meeting, Boisselle met with Dineen, one of the on-duty police officers, to discuss security issues, among other matters. Boisselle thanked Dineen for attending the meeting to "keep the peace" and directed him "not to hesitate in removing any individual who caused a scene during the meeting." (Id. ¶ 12.) The Committee meeting was videotaped by ABC News and South

Hadley Community Television. (Id. ¶ 14; Plaintiff's Response to Defs. SOF ("Pl. SOF") ¶ 14.) Copies of both videotapes have been submitted by the parties and reviewed by the court. (*See* Defs. Ex. I; Pl. Ex. 8.) Plaintiff attended the meeting, along with approximately seventy-five residents of the community and members of the media. (Defs. SOF ¶ 15.)

Prior to recognizing any speaker, Boisselle announced several restrictions that would be placed on speakers during the public comment portion of the meeting. Specifically, Boisselle limited speakers' comments to three minutes and, in an effort to respect the privacy of the Prince family, prohibited any "conversation about the Prince family, Phoebe Prince, or any of . . . her activities or allegations related to that case." (Id. ¶ 16; Defs. Ex. K at 16-17.) Boisselle also made some introductory remarks in which he expressed his support for Sayer and Dan Smith, South Hadley's principal, and praised the administration's efforts to combat bullying, stating that "[the Committee] probably [has] addressed this problem as much, if not more so, than any other community" and asserting that, because "there are no facts that support any of [the] allegations that [the Committee had] heard in the last few weeks [regarding their efforts to protect students], then there's no action that should be taken." (Defs. Ex. K at 14.) Following his remarks, Boisselle opened the floor to public comment. (Defs. SOF ¶ 17.)

Besides Plaintiff, fifteen individuals spoke during the public comment portion of the Committee meeting. The record indicates that seven individuals criticized the Committee, seven individuals praised the Committee, and two individuals' comments appear neither overtly critical or supportive of the Committee such that they could be characterized as either. Among those individuals critical of the Committee, in addition

to Plaintiff, were Bob Krok and Darby O'Brien. Krok accused members of the Committee of engaging in a "cover up" and having "dropped the ball" and urged the community "to get rid of 'em" because they are "just a noose on the neck of this town," while using a hand gesture imitating a noose. (Defs. Ex. K at 18-19.) Following this remark, Boisselle interrupted Krok and told him, "You are done." (Id. at 19.) Krok was escorted out by the police. (Pl. Ex. 9 at 4.) O'Brien, another critic of the Committee's handling of events surrounding Prince's death, asked that the "individuals who could have stepped in and stopped [the bullying] at any time along the way [be held] responsible." (Id. at 11.) O'Brien, who was interrupted once by Boisselle, was allowed to use the entirety of his time. Following O'Brien's comments, Boisselle noted that although "during public comment [members of the Committee] usually don't respond," he criticized O'Brien for incorrectly portraying himself to the national media as the Prince family spokesperson. (Defs. Ex. K at 40.) The remaining speakers critical of the Committee were allowed to utilize the entirety of their time without serious interruption or rebuttal by Boisselle, as were the individuals who spoke in support of the Committee.

Plaintiff was the second speaker of the night. Before speaking, Plaintiff began distributing a prepared two and a half page type-written statement to each member of the Committee. At this point, Kathy Mazur, a member of the Committee, stated that Plaintiff was "using up his three minutes of time." Plaintiff responded that he had not yet begun speaking. Boisselle replied, "Yeah. Please, move. There are other people here waiting to talk." Plaintiff then began reading from his prepared statement, which included the following exchange:

Plaintiff: I respectfully bring to you my concerns and wishes regarding the matter

of the unfortunate and what now appears to have been the preventable death of one of our young students and the subsequent criminal charges of at least six other of our young citizens which I now firmly believe all of which could have and should have been prevented by the administrators that were charged with their care and custody. There has been much new information that has come to light regarding this -- the matter at hand in the past several weeks. Specific information has been brought to your attention by the District Attorney and more recently by me. And this information has been confirmed and corroborated by --

Boisselle: Hang on.

Plaintiff: -- the superintendent --

Boisselle: Excuse me. Excuse me.

Plaintiff: -- and the Committee chair --

Boisselle: No. This is my meeting, Mr. Gelinas. When I say excuse me, please be quiet. You are stating that new information has been confirmed and corroborated by the School Committee chair and the superintendent. You called me last week --

Plaintiff: Excuse me. Mr. Chair --

Boisselle: -- and you -- No. No.

Plaintiff: -- is this taking away from my time?

Boisselle: No. No. No, not excuse me. This is --

Plaintiff: This is taking from my time.

Boisselle: -- the School Committee's meeting, Mr. Gelinas. If you speak again, you won't have another opportunity. But I want to say that here has been -- This information that you referred to is just the type of information that the Prince family has asked us not to disclose from day one. And I know that you said that you got it from the Prince family spokesman, but it is confidential information that should not be discussed in any way as far as this girl's private life prior to her death. And for you to say in public that I have corroborated that is simply not true. I'll allow you to go on, but when I see something that is simply factually not true, I'm not going to allow this game to continue.

Plaintiff: And may I --

Boisselle: Please, continue.

Plaintiff: May I respectfully ask the Chairman to save his comments for when I'm done and I can address them?

Boisselle: No, you can't. This is our meeting.

Plaintiff: Very good, sir.

Boisselle: But, please, go right ahead.

Plaintiff: Very good, sir. And that meeting -- This is all related to a meeting that I had with Superintendent Sayer.

Boisselle: What --

Plaintiff: And I spoke with you about it afterward. Getting back to what I was saying -- And I'll go back to on the clock now. -- it is now public knowledge that there are many inconsistencies between what the principal has stated regarding his findings and the investigation and the new information. In light of this new discovery, I feel that it is your duty to your constituents and to the good people of the Town of South Hadley to either dismiss Superintendent Gus Sayer and the high school principal, Dan Smith, or recommend that their contracts not be renewed, as well as provide censure and/or removal of the Committee chairperson, Mr. Edward Boisselle. Many citizens, officials, statements including the Governor of the State of Massachusetts have examined the information at hand and concur that it is now time to hold --

Boisselle: Hang on. Hang on.

Plaintiff: -- responsible --

Boisselle: Stop.

Boisselle: I think it's time for you to sit down, Mr. Gelinas.

Plaintiff: Excuse me, sir. I was interrupted.

Boisselle: No. No. No.

Plaintiff: If you want -- if you want to strike from the record, then, please, strike from the record.

Boisselle: And rightfully so.

Plaintiff: Please strike from the record and allow me to continue, sir.

Boisselle: No. You are done. Who else would like to speak?

Plaintiff: That not no, sir.

Boisselle: You are --

Plaintiff: This is my first amendment right.

Boisselle: Mr. Gelinas, this is not your first amendment right.

Plaintiff: I did not go outside --

Boisselle: You are --

Plaintiff: --the purviews.

Boisselle: -- here as a guest of the School Committee. And it's your first amendment right --

Plaintiff: I'm a citizen of --

Boisselle: -- to go outside on the street --

Plaintiff: -- South Hadley, sir.

Boisselle: -- and talk to whoever wants to talk to you.

Officer Dineen:[1] Excuse me. He asked you to leave twice.

Boisselle: Please, leave.[2]

Plaintiff: Yes, sir.

---

[1] Although the transcript reflects only that this statement was made by "Male Voice," (Defs. Ex. K at 28), the record indicates that this statement was made by Officer Dineen. (Pl. Ex. 16 at 23.)

[2] Although the transcript indicates that Boisselle expressly asked Plaintiff to leave *after* Officer Dineen stated to Plaintiff that he had been asked to leave twice, the video recordings submitted by the parties indicate that Officer Dineen's statement *followed* Boisselle's request that Plaintiff leave. (Defs. Ex. I (ABC News Video).)

(Defs. Ex. K at 21-28.) At this point, Gagne and Dineen began to escort Plaintiff out, touching him only for directional purposes and not injuring him in any way. (Defs. SOF ¶ 31.) As Plaintiff was leaving, an individual called out, "Bully," and Plaintiff turned around, asking the Committee "why isn't this censured and why isn't this removed?" (Defs. Ex. K at 8.) At that point, Plaintiff left the meeting escorted by Gagne and Dineen.

## II. Standard of Review

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp*., 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

## III. Discussion

### A. Section 1983 Claim against Boisselle (Count I)

Plaintiff and Defendants both move for summary judgment as to Boisselle. Defendants assert that Plaintiff has failed to establish a First Amendment violation and that Boisselle is entitled to qualified immunity. As might be expected, Plaintiff takes the opposite position.

The qualified immunity inquiry comprises a two party test. A court must determine whether (1) the plaintiff's allegations, if true, establish a constitutional violation and, if so, (2) whether the constitutional right at issue was clearly established at the time of the putative violation. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Here, Plaintiff bears the burden of proof as to whether a constitutional violation occurred and Boisselle bears the burden of proof as to whether he is entitled to qualified immunity. *See Liggins v. Clarke County Sch. Bd.*, Civil Action No. 5:09CV00077, 2010 WL 3664054, at *6 (W.D. Va. Sept. 17, 2010).

1. <u>Whether Plaintiff has Established a Constitutional Violation</u>

"It is axiomatic that not every limitation on freedom of expression insults the First Amendment. A curtailment of speech violates the Free Speech Clause only if the restricted expression is, in fact, constitutionally protected and if the government's justification for the restriction is inadequate." *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (internal citations omitted). It is also well-settled "that the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). The government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836

(1976). To be sure, the parties here dispute whether the school committee meeting was a "designated public forum" or a "limited public forum." *See Del Gallo v. Parent*, 545 F. Supp. 2d 162, 178 (D. Mass. 2008), *aff'd*, 557 F.3d 58 (1st Cir. 2009) (noting that a designated public forum is "property that the government has intentionally opened for expressive conduct by part or all of the public," as distinguished from a limited public forum or nonpublic forum which is "property not open by tradition or explicit designation to the public for expressive activities."). However, since for present purposes, Plaintiff asserts only that the Committee's refusal to let him speak constituted viewpoint discrimination, which is impermissible in any forum, the court need not address the nature of the forum. *See AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 12 (1st Cir. 1994) (finding forum analysis unnecessary when restriction violates prohibition on viewpoint discrimination). Accordingly, the court turns directly to Plaintiff's claim that Boisselle engaged in impermissible viewpoint discrimination by silencing him on account of his critical statements to the Committee and his call for its members' censure and removal.[3]

The "essence of a viewpoint discrimination" is a "governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). A claim of viewpoint discrimination in this circuit may also require "invidious intent on the

---

[3] Plaintiff also alleges in his complaint that the Committee's restriction limiting comments regarding Phoebe Prince constituted an impermissible content restriction, but he appears to have set aside that claim for summary judgment purposes given Boisselle's admissions "that [Plaintiff] did not disclose confidential or personal information about Phoebe Prince." (*See* Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 14 n.7.)

part of the relevant government officials." *Del Gallo v. Parent*, 557 F.3d 58, 76 (1st Cir. 2009) (citing *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004)). Here, Defendants argue that there is no evidence that Boisselle was "openly hostile" to Plaintiff because of his views and, further, that Boisselle silenced Plaintiff for the following viewpoint neutral reasons: (1) the limitation on any "conversation about the Prince family, Phoebe Prince, or any of her activities or allegations related to that case" represented a reasonable and viewpoint neutral limitation, (2) Boisselle reasonably silenced Plaintiff to preserve order and decorum after Plaintiff was called out of order numerous times, although Plaintiff did not speak uninterrupted for three minutes, and (3) Boisselle justifiably asked Plaintiff to stop speaking because he spoke out of order and "had the floor for approximately four minutes."[4]

The court finds Defendants' three-part rationale unpersuasive for purposes of their summary judgment motion. First, any claim that Boisselle silenced Plaintiff because he violated the rule barring discussion of personal issues concerning Phoebe Prince and her family is belied by the present record. Although Boisselle, at some point late in the meeting, did allude to Plaintiff's violation of this restriction as part of his reason for silencing him, there is no indication that Plaintiff actually revealed any such

---

[4] Although Defendants initially stated that Boisselle refused to allow Plaintiff to speak because he had "reasonable concerns about Family Education Rights and Privacy Act ("FERPA"), as well as general privacy violations which may not have been covered by FERPA if he allowed members of the public to speak about matters identified as prohibited by the Prince Family attorney," (Defendants' Motion for Summary Judgment at 20), they appear to have abandoned this argument in their reply memorandum, in which they state that "Boisselle did not ask [Plaintiff] to stop speaking because he violated FERPA." (Defendants' Reply Memorandum at 11.) Rather, Defendants argue, Boisselle only silenced Plaintiff for"reasonable viewpoint reasons."

information. To the contrary, the statement that prompted Boisselle to cut Plaintiff off had nothing to do with personal details concerning the Prince family but, rather, the removal and censure of Committee members, including Boisselle.

To be sure, Defendants argue that Boisselle reasonably anticipated that Plaintiff would violate the content restriction because the second page of his prepared statement, which Plaintiff began to read at the meeting and which he distributed to members of the school committee, addressed personal matters related to the Prince family. However, Defendants do not argue that Plaintiff's distribution of the previously prepared statement (to Committee members only) violated the restriction, and there is no indication in the record that, once aware of the content restriction, Plaintiff intended to read any off-limit statements. Indeed, Boisselle himself acknowledged at his deposition that at no time did Plaintiff actually disclose any personal information that would have been covered by the restriction. (Pl. Ex. 2 at 68.)

Second, the court finds insufficient evidence to conclude at this stage of the proceedings that Boisselle terminated Plaintiff's speech because he had exceeded his three minute time limit, regardless of whether Plaintiff's distribution of a written statement detracted from his speaking time or because he "had the floor for approximately four minutes." Boisselle himself implied at his deposition that he actually believed Plaintiff was entitled to additional speaking time because of his interruptions; Boisselle also testified that the decision to extend a speaker's time "would be at the discretion of the chair" and that he "in fact did add extra time for [Plaintiff] to compensate for the time that [he] was speaking," although that does not appear to be

borne out by the record. (Pl. Ex. 2 at 69.) In fact, Boisselle was not even certain that Plaintiff had exceeded the three minute time limit when he was asked to leave, stating at his deposition only that he "believe[d] [Plaintiff] was very close." (Pl. Ex. 2 at 70.) Moreover, unlike other individuals who were given notice that they had nearly exhausted their time, Plaintiff received no such warning. (*See* Defs. Ex. K at 39, 68, 75-76.)

Third, Defendants' assertion that Boisselle silenced Plaintiff to preserve order and decorum at the meeting is questionable. To be sure, there is some merit to Defendants' argument that Plaintiff continued to speak above Boisselle several times. The first time Boisselle interrupted Plaintiff, the two continued to speak over each other, but Boisselle chose not to silence Plaintiff; rather, Boisselle simply admonished Plaintiff, "If you speak again, you won't have another opportunity," and allowed him to go on. However, during a second exchange in which Boisselle ordered Plaintiff to sit down, it is arguable that Plaintiff was not out of order at all. Plaintiff, who began to say that "it is now time to hold –," was interrupted mid-sentence by Boisselle's interjection, "Hang on. Hang on," followed by Plaintiff's mere utterance of the word "responsible." (Defs. Ex. I; Pl. Ex. 8.) This single word, the court finds, is insufficient to conclude as a matter of law that Boisselle silenced Plaintiff because he was out of order, especially given that Boisselle did not provide such a reason at the meeting. *See Liggins*, 2010 WL 3664054, at *11 (finding there existed a genuine issue of material fact regarding a chairperson's motive for silencing an individual where the chairperson's "asserted basis for silencing [the plaintiff was] entirely different from that which she provided at the actual meeting"). And, although Plaintiff did turn around and yell at the Committee after

a member of the community shouted the word "Bully!," the court is unable to conclude that Plaintiff "voiced his initial remarks in such a tone or manner as to threaten disruption of the orderly conduct of the meeting." *Id.* at *8.

In many ways, the instant action is similar to the situation in *Liggins*, where the school board held a meeting, in part, to consider whether to demote a school principal, an African-American. *Id.* at *1. During the public comment portion, the plaintiff -- a member of the community -- criticized the school board and accused its members of violating the Civil Rights Act. The chairperson then interrupted the plaintiff, stating that she would not tolerate the plaintiff's accusations that the board had committed an illegal act and asked the plaintiff to sit down. When the plaintiff refused to sit down, the chairperson called for the sheriff, but the plaintiff then sat down and avoided ejection from the meeting. Following the meeting, the plaintiff commenced a lawsuit under section 1983, claiming that the chairperson violated his First Amendment rights. *Id.* at *2-3. In considering whether the Plaintiff had established a constitutional violation, the court noted that the chairperson's claimed justifications for silencing the plaintiff were not those offered during the meeting. As a result, the court found that a factual question remained regarding the chairperson's motive in silencing the plaintiff and, accordingly, refused to grant her motion for summary judgment. *See id.* at *10-11 ("[W]here . . . [the chairperson's] asserted basis for silencing [the plaintiff] is entirely different from that which she provided at the actual meeting . . . a jury could find that [the defendant] had no reasonable basis for fearing disruption, and . . . silenced [the plaintiff] solely because she objected to the viewpoint he expressed.").

Here, as in *Liggins*, the court finds a genuine issue of material fact regarding Boisselle's motive for silencing Plaintiff when he was calling for the removal of members of the Committee. *Id.* at *11. Indeed, at least one of the justifications offered by Boisselle during the meeting -- that Plaintiff had violated the rule governing the Prince family's privacy -- has since been conceded by him to have been incorrect. A jury should also be given the opportunity to consider Boisselle's actions with in the context of his treatment of several other individuals who spoke critically of the Committee. *See McGuire*, 386 F.3d at 63-64 ("Perhaps the standard for allowing . . . an inference of intent from a pattern of impact would be more plaintiff-friendly in the First Amendment context, given the special place that First Amendment rights have traditionally held in our constitutional jurisprudence."). One of those individuals, Krok, was silenced by Boisselle and also escorted out of the building. As for another critic, O'Brien, Boisselle, by his own description, took the unusual step of rebutting parts of his statement. In contrast, none of the individuals who spoke in support of the Committee were interrupted, rebutted, or escorted out of the meeting.

Granted, Defendants argue that, even if the rationales Boisselle provided are insufficient to establish that he did not engage in viewpoint discrimination, the fact that he allowed several of the Committee's critics to speak for their allotted time without interruption demonstrates as a matter of law that his treatment of Plaintiff was not motivated by any desire to suppress a particular point of view. The court disagrees. As the First Circuit has noted, "[v]iewpoint discrimination concerns arise when the government intentionally tilts the playing field for speech; reducing the effectiveness of a

message, *as opposed to repressing it entirely*, thus may be an alternative form of viewpoint discrimination." *Ridley*, 390 F.3d at 88 (emphasis added). Accordingly, Defendants may pursue their defense before a jury so as to provide the larger context to the meeting, as no doubt Plaintiff will invoke yet another critic's statement concerning Boisselle's conduct. (*See* Defs. Ex. K at 70-71) (critic's statement that she is "probably going to get escorted out" for expressing her opinion that she "really wish[ed] everyone, everyone, had the chance and the opportunity to say how they felt here tonight. Some people did. If you were pro-school, you had the floor. That's how I feel.")

In sum, viewing the record in the light most favorable to Plaintiff, the non-moving party with respect to Defendants' motion, the court concludes that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Boisselle prevented him from speaking solely on the basis of his viewpoint, thereby violating his First Amendment rights. Accordingly, the court is prepared, subject to its discussion of qualified immunity below, to deny Defendants' motion for summary judgment. Concomitantly, the court finds that Boisselle, who allowed four of the seven critics to speak uninterrupted and unrebutted, has also raised genuine and material factual issues regarding his motivation when silencing Plaintiff, to defeat Plaintiff's motion for summary judgment.

2. Qualified Immunity

Having determined that there is sufficient evidence of a First Amendment violation to withstand summary judgment, the court must determine, in relation to Defendants' claims of qualified immunity, whether Boisselle's conduct "violate[d] clearly

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As the Supreme Court has explained, "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

The First Circuit has thus divided the qualified immunity analysis into the following two parts: (1) the clarity of the law at the time of the alleged civil rights violation, and (2) whether, given the particular facts in a case, a reasonable defendant would have understood that his or her conduct violated a claimaint's constitutional rights. *See Glik v. Cunniffe*, No. 10-1764, 2011 WL 3769092, at *3 (1st Cir. Aug. 26, 2011). An affirmative finding on these inquiries does "not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id*. At bottom, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.* (quoting *Maldonado*, 568 F.3d at 269).

Here, Defendants argue that a reasonable person in Boisselle's position would not have known that ejecting Plaintiff was a violation of clearly established First Amendment rights. For support, Defendants point to Boisselle's comments that he considered Gelinas a guest of the Committee who was allowed to speak only in

accordance with established Committee rules and that, as chairman, he had the authority to eject any person who exhibited improper conduct or made defamatory or abusive remarks. But Defendants cite no law, and the court is not aware of any, which indicates that the law prohibiting viewpoint discrimination was not clearly established at the time of Committee meeting here. Indeed, despite Defendants' reliance on the split decision in *Collinson v. Gott*, 895 F.3d 994 (4th Cir. 1990), a concurrence there acknowledged that it was clearly established that an individual in a school committee meeting could *not* silence a speaker solely on the basis of his or her viewpoint. *Id.* at 1000 (Phillips, J., concurring) (holding "as a matter of law" that a reasonably competent official is not permitted to rule a speaker out of an order and evict him "if he had no reasonable basis for fearing disruption, or if his actual purpose was to prevent expression of [the speaker's] viewpoint"); *see also Liggins*, 2010 WL 3664054, at *11 (same). And unlike the undisputed facts in *Collinson*, where the chairman of the public meeting was found to be entitled to qualified immunity, there is here a genuine dispute as to whether Boisselle's motive was to ensure the orderly conduct of the meeting or to suppress Plaintiff's viewpoint on the subject matter under discussion. Accordingly, the court will deny Defendants' motion for summary judgment as to Boisselle.[5]

B. Section 1983 Claims Against Gagne and Dineen (Count II)

Plaintiff also alleges that Gagne and Dineen violated both his First and Fourth

---

[5] At the motion hearing, the court questioned, albeit indirectly, whether Boisselle might be immunized from suit under the Volunteer Protection Act, 42 U.S.C. § 14501 *et seq*. Defendants indicated, however, that the Act expressly excludes limitations on liability where, as here, the alleged misconduct "violated a Federal or State civil rights law." 42 U.S.C. § 14503(f)(1)(D).

Amendment rights by removing him from the School Committee meeting. The court will address each claim in turn.

To prevail under section 1983 claim for a violation of his First Amendment rights, Plaintiff must show that Gagne and Dineen "intended to inhibit speech protected by the First Amendment . . . and that the[ir] conduct had a chilling effect on the protected speech that was more than merely speculative, indirect or too remote." *Dolan v. Tavares*, Civil Action No. 10-10249-NMG, 2011 U.S. Dist. LEXIS 73601, at *18 (D. Mass. May 16, 2011) (internal citation omitted). It is widely recognized, however, that questions of motive and intent will generally preclude a court from granting summary judgment. *See Dolan*, 2011 U.S. Dist. LEXIS 73601, at *18. Nonetheless, the First Circuit has recognized that summary judgment may be appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences [or] unsupported speculation." *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996).

Here, the complaint is devoid of any factual allegation that Gagne and Dineen removed Plaintiff to inhibit his speech. Moreover, the record before the court indicates that Gagne and Dineen removed Plaintiff simply because he did not leave when Boisselle asked him to do so. (*See* Defs. Ex. H, Dineen's Answers to Plaintiff's Interrogatories at 4 ("At the School Committee Meeting, [Boisselle] told [Plaintiff] to leave. I understood this to mean that [Plaintiff] should be escorted out if he did not comply with [Boisselle's] request."); Defs. Ex. J, Gagne's Answers to Plaintiff's Interrogatories at 3 ("As [Plaintiff] was a guest of the School Committee meeting, I concluded that [Boisselle] did not want [Plaintiff] to remain at the meeting. Therefore, I

told [Plaintiff] that he had been told to leave the meeting by [Boisselle].")). Even more to the point, Plaintiff does not dispute Defendants' specific argument that Dineen and Gagne removed Plaintiff to preserve order and decorum at the meeting. Thus, the court finds Plaintiff's arguments that Dineen and Gagne violated his First Amendment rights insufficient to defeat Defendant's motion for summary judgment as to them.

Plaintiff, however, also alleges that Gagne and Dineen lacked probable cause to remove him from the school committee meeting and that their doing so constituted an unconstitutional seizure in violation of the Fourth Amendment. In response, Gagne and Dineen assert that Plaintiff's Fourth Amendment rights were not violated because their actions were objectively reasonable based on the totality of the circumstances. They further argue that, even if Plaintiff has established a Fourth Amendment violation, they are entitled to qualified immunity.

The court concludes that Gagne and Dineen are indeed entitled to qualified immunity. Accordingly, it sees no need to address the Fourth Amendment question further. In short, Plaintiff does not dispute the following facts: (1) Dineen "'touched [him] for directional purposes' as [Dineen] escorted [him] out of the meeting'" and Gagne "'touched [him] briefly under one of his elbows with the cup of [his] hand in order to direct him to the side of the room, and (2) "the contact lasted for a matter of seconds and [Plaintiff] was not injured in any way. (Plaintiff's Response to Defendants' Concise Statement of Facts ¶¶ 31-33.) Moreover, as described, Gagne and Dineen escorted Plaintiff out of the meeting in accordance with an order they received from Boisselle prior to the meeting to "keep the peace" and "not to hesitate in removing any individual

who caused a scene during the meeting." (Id. ¶ 12.) The record also indicates that Gagne and Dineen's conduct was courteous and in accord with a presumably valid direction they received from the official presiding over the meeting. Because "[r]easonable officers in their positions would have no basis for believing that under the circumstances their conduct would violate Plaintiff's constitutional rights," *Collinson,* 895 F.2d at 1004-1005, the court will grant their motion for summary judgment.

C. MCRA Claim Against All Defendants (Count III)

To establish an MCRA claim, Plaintiff must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts has been interfered with, or attempted to be interfered with, by threats, intimidation or coercion. *See* MASS. GEN. L. ch. 12, §§ 11H and 11I. Although the MCRA is the state "counterpart" to section 1983 and is basically "coextensive with" the federal statute, there are some differences. For example, to succeed on an MCRA claim, a plaintiff, unlike with section 1983, must show that the derogation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.*, 532 N.E.2d 49, 52 (Mass. 1989). "A 'threat' means the 'intentional exertion of pressure to make another fearful or apprehensive of injury or harm.'" *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009) (quoting *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 631 N.E.2d 985 (1994)). "Intimidation" means putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. *Id.*

The MCRA contemplates a two-part sequence: liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do. *See Goddard*, 629 F. Supp. 2d at 128. Thus, as an initial matter, because Plaintiff has not established that Gagne and Dineen violated his constitutional rights, his MCRA claim against them must also fail. *See* MASS. GEN. L. ch. 12, §§ 11H and 11I; *see also Parks v. Town of Leicester*, Civil Action No. 10-30120-FDS, 2011 WL 864823, at *5 (D. Mass. March 9, 2011) (for purposes of the MCRA, "the element of 'threats, intimidation, or coercion' must be separately present *in addition* to the violation of rights.") (emphasis added).

The court finds, however, that Plaintiff's MCRA claim against Boisselle should survive. "[I]n order for threats, intimidation or coercion to be found, the Supreme Judicial Court normally requires a showing of an actual or potential physical confrontation accompanied by a threat of harm." *Fletcher v. Szostkiewicz*, 190 F. Supp. 2d 217, 230 (D. Mass. 2002) (internal quotation marks omitted). As has been noted, however, "[a]lthough many cases decided by the Supreme Judicial Court have involved actual or potential physical confrontations, it is settled that the MCRA also encompasses the application of 'moral force' so as to constrain a person to do against his will something he would not have done." *Lebeau v. Town of Spencer*, 167 F. Supp. 2d 449 (D. Mass. 2001) (internal quotation marks omitted).

Here, it is undisputed that prior to the school committee meeting, Boisselle met with Dineen and authorized him to "keep the peace" and "not to hesitate in removing any individual who caused a scene during the Meeting." (Defs. SOF ¶¶ 12-13; Pl. Ex.

10 (Dineen's Answers to Plaintiff's Interrogatories) at 4 ("[I]t was discussed that if a member of the public got out of line, they would be asked to leave and would be escorted out of the room by the police officers present.").) It is also clear that Plaintiff did not wish to stop speaking. Following Boisselle's insistence first that he sit down and later to leave, Plaintiff asked Boisselle to reconsider, stating that he could strike certain statements from the record and accusing Boisselle of infringing on his First Amendment rights. Construing the facts in a light most favorable to Plaintiff, the following scene thus emerges from the record: Boisselle interrupts Plaintiff and orders him to sit down; when Plaintiff protests, Dineen and Gagne, acting pursuant to Boisselle's earlier instructions, approach Plaintiff; as the officers near Plaintiff, Boisselle expressly orders him to leave, and Plaintiff, now confronted by the officers, obeys. In this context, the court is unpersuaded that Boisselle's failure to give a direct order to Dineen and Gagne to remove Plaintiff in any way dilutes the potential coercive effect of Boisselle's command that Plaintiff stop speaking. Indeed, whatever the precise contours of the "moral force" standard under the MCRA, the court is satisfied that a reasonable jury could conclude that Boisselle's actions constrained Plaintiff to unwillingly surrender his First Amendment right to criticize the Committee. That is enough to defeat Defendants' motion for summary judgment on Plaintiff's MCRA claim against Boisselle.

## IV. CONCLUSION

For the reasons stated, Plaintiff's motion for summary judgment is DENIED. In addition, Defendants' motion for summary judgment is DENIED with regard to Plaintiff's section 1983 and MCRA claims against Boisselle, but is otherwise ALLOWED. The

Clerk's Office shall schedule a final pre-trial conference and trial date.

IT IS SO ORDERED.

DATED: October 17, 2011

/s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge